# CIRCUIT COURT OF BALTIMORE CITY.

Filed May 13, 1896.

THE DETROIT FERTILIZER & CHEMICAL CO., ET AL.,

VS.

WOOLRIDGE FERTILIZER COMPANY, ET AL.

*Lanahan & Gosnell* for plaintiffs.

*Rhodes & Rhodes* and *W. George Weld* for defendants.

DENNIS, J.—

In August, 1891, Robert A. Woolridge was engaged in the fertilizer business in the city, under the name of R. A. Woolridge & Co. He was indebted in the sum of $130,000, of which $98,000 was due to Edmund J. and B. F. Folsom, trading as B. F. Folsom & Company of Boston, and $10,000 to one Jelke, his father-in-law, and was utterly insolvent.

Being anxious to "unload his debts," as he himself expressed it, and the Folsoms being desirous of securing themselves, the following scheme was devised and put into execution by them:

A charter was obtained from the State of West Virginia for the defendant corporation, the Woolridge Fertilizer Company, with a capital stock of $100,000, divided into 1000 shares of the par value of $100 each, the principal office being in Baltimore City. The incorporators were the said Woolridge, the said Edmund J. Folsom, McInnes (the son-in-law of the said Edmund J. Folsom, and the legal adviser

of the firm of B. F. Folsom & Co.), and one Edmunds and one Thurston. The control of the concern was, therefore, wholly in the hands of Woolridge and Folsom and Company.

The corporation was formed for the express purpose of acquiring the property and business of the said Woolridge, trading as R. A. Woolridge & Co., which at that time was insolvent, and could not have paid fifty cents on the dollar.

After the company was organized, Woolridge exhibited a statement of his assets and liabilities. The former (of varied character, and many being choice specimens of the kind known as *Wild Cats;* and all put in at their cost price to him; his trade-marks and *good will* being also included as worth ($60,000), amounted to an assumed valuation of $202,000, (although at the receiver's sale the total assets, including trade-marks and everything, only realized $13,000), while his liabilities were the $98,000 due Folsom & Co., $10,000 due his father-in-law, and $25,000 general indebtedness, making a total liability of $132,000.

Folsom & Co., in order to further the scheme, deducted from their claim the sum of $10,000, thus leaving the net liabilities $102,000.

With the affairs of Woolridge in this insolvent condition, when, according to his own evidence, he could not have paid fifty cents on the dollar, the Woolridge Fertilizer Company, thus controlled, agreed to take all the assets of Woolridge and agreed to pay therefor not only all the debts then due by him, amounting to $202,000, but in addition thereto agreed to issue to him as fully paid; its entire capital stock of $100,000; thus, in fact, giving to Woolridge $202,000, for that which he admitted upon the stand would not have realized $70,000.

This transaction was consummated as follows: All the assets of Woolridge were transferred to the company, and in payment therefor it issued to Woolridge its capital stock as full paid, amounting to $100,000; it issued to Woolridge its coupon promissory notes amounting to $78,000, and it assumed all the outstanding obligations of Woolridge, which amounted to $25,000. Upon Woolridge's receipt of the $78,000, coupon notes, he transferred $68,000 to B. F. Folsom & Co., in payment of his debt to them, and he transferred $10,000 to his father-in-law, in payment of his debt.

Thus the net result was that the Woolridge Fertilizer Co. owned all the assets of the insolvent business of Robert A. Woolridge, at a grossly excessive over-valuation, and had assumed all the debts of Woolridge, amounting to $102,000, and had all its capital stock of $100,000 outstanding, issued as fully paid, without a dollar in its treasury, except about $2,000 in cash which was turned over by Woolridge.

Then came, what seems to me, one of the most significant facts in the whole transaction, and which gives color to the entire scheme from its inception. No sooner had this transaction been accomplished, and B. F. Folson & Co. received $68,000 of the notes of the Woolridge Fertilizer Co. for their debt against Woolridge, than they, with Woolridge's co-operation and consent, assumed entire control of the corporation, by an agreement which provided as follows:

Woolridge transferred 600 of his 1,000 shares of stock to McInnis (son-in-law of E. J. Folsom, and legal adviser of B. F. Folsom & Co.), one Hoffman (bookkeeper and general manager of B. F. Folson & Co.), and Edmund J. Folsom, himself, *in trust* to secure the prompt payment of said notes; and then the agreement went on to provide, among other things:

The trustees were compelled to vote the stock *as directed by B. F. Folsom & Co.*

The trustees were to take such action as they might deem necessary or proper for the *"security of said* notes."

So long as the *"Company promptly paid the principal and interest of said notes,* the presidency and management of the business of the Company was to be in the hands of Robt. A. Woolridge, or in the case of his death, the *nominee*

of his executor or administrator (unless in the opinion of the trustees the security of said notes would be likely impaired).

In case of the death of one of the trustees, his successor was to be appointed in the interest of the Folsoms.

In default of payment of the notes or interest, the six hundred shares of stock were to be sold to pay the same:

No dividends were to be paid on the stock until *all the notes were paid:*

And many similar provisions,—all in the interest of B. F. Folsom & Co.

It will thus be seen that the corporation was organized and controlled in the interest of B. F. Folsom & Co., for the *sole purpose* of securing the debt due them by Woolridge, (saddled upon the corporation as above detailed), at the expense of *bona fide* creditors of the corporation; or, as Woolridge expressed it, referring to the scheme, "I was anxious to unload my debt, and I thought this was a way out of my difficulties."

It is also to be noted that the above recited transactions and agreements between Folsom & Co. and Woolridge were wholly unknown to the present plaintiffs and other creditors of the Woolridge Fertilizer Company, until about the time of the institution of the present proceedings.

Thus organized and controlled, the corporation conducted business for about two years, during which time it contracted numerous debts, the plaintiff's present claims amounting to over $20,000, until it finally succumbed and was placed in the hands of a receiver. During this time it paid off the coupon notes given to Folsom & Co. and to Jelke (in substitution for their old debts against Woolridge individually) over $11,000; and an attempt was made to cancel $15,000 more of the Folsom & Co. notes as follows: In December, 1892, Woolridge, Folsom, McInnes and Hoffman passed a resolution whereby the Woolridge Fertilizer Co. was to convey to B. F. Folsom & Co. the Smith's Wharf property in this city, a part of its assets, for the alleged consideration of $15,000; but instead of the money being paid into the business

of the concern, coupon notes of Folsom & Co. to the extent of $15,000 were cancelled; and these notes were not those soonest to fall due, but those which would only mature as late as 1898, 1899, 1900, 1901, 1902 and 1903.

It will thus be seen that, in pursuance of the contract between Woolridge and the Folsoms, of which the other creditors of the Woolridge Fertilizer Company know nothing until shortly before this bill was filed, the assets of the Woolridge Fertilizer Company were being absorbed in the payment of the old debt of the Folsoms which Woolridge had "unloaded" upon the corporation, to the prejudice of the other creditors of the corporation whose claims were maturing daily.

From the above recital of facts, it goes almost without saying that the payments made to B. F. Folsom & Co. cannot stand for a moment in a Court of equity, as against the creditors proper of the corporation.

The coupon-notes of the corporation issued to them in place of their old debt, against Woolridge, were, as against the creditors of the Woolridge Fertilizing Company, wholly without consideration; for when the corporation issued to Woolridge its whole capital stock as fully paid, they gave him far more than his assets were worth according to his own uncontradicted testimony and hence the coupon-notes amounting to $78,000, issued to him, and by him transferred to Folsom & Co. and Jelke, rested upon no consideration whatever, and were void as against the bona-fide creditors of the corporation who became such without the knowledge of the secret agreement and arrangements between the Folsoms and Woolridge.

The assets of the corporation must be first applied, therefore, to the payment of those creditors; and the deed to the Smith's Wharf property set aside and the property sold by the receivers; and in the distribution of assets, the claims of Folsom & Co. and Jelke must be postponed to those of the plaintiffs and such other creditors as may stand on a similar footing.